IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 20-CR-124(APM) |
| vs. | ) | |
| | ) | |
| JOEY GREEN-REMACHE, | ) | |
| Defendant. | ) | |

**UNITED STATES' NOTICE OF INTENT TO OFFER EXPERT TRIAL TESTIMONY**

Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, the United States hereby provides notice that it may introduce the testimony of FBI Forensic Examiner Amanda Bakker, and Chitra Raghavan, Ph.D., to testify on matters that may be considered opinion or expert testimony.  Ms. Bakker and Dr. Raghavan's Curricula Vitae are attached to this notice.

**FBI Forensic Examiner Amanda Bakker**

The government expects to call FBI Forensic Examiner Amanda Bakker as an expert witness at trial in the above-referenced case in the fields of forensic DNA testing and analysis. At the trial, Ms. Bakker will testify factually about the quality assurance measures taken to ensure the integrity of testing results, and about the tests for the presence of DNA specifically, including how they are performed and interpreted.  In addition, she will testify factually about DNA in general (i.e., what it is, where it can be found, its uniqueness, its durability, and use in forensics) and the testing process used during the testing in this case.  Ms. Bakker will discuss the likelihood that random persons would share the same DNA, in whole or part.  She will also explain that an individual may transfer his or her DNA to another person or object through

1

physical contact. DNA may be left behind in bodily fluids such as blood, saliva, or semen. She will explain that skin cells also contain DNA, and that a person may, or may not, leave behind skin cells after making physical contact with their skin and an object. Even if skin cells or bodily fluids are left behind on such objects, in some cases, the amount of cells or DNA left behind on the surface may not be sufficient to analyze.

Ms. Bakker will testify generally about DNA testing procedures, including extraction, quantitation, amplification, detection, and sample comparison. She will also testify about the process for screening items for male DNA. Ms. Bakker will testify generally about tests conducted for the presence of DNA, including the Polymerase Chain Reaction ("PCR") / Short Tandem Repeat ("STR") testing process, and how the results of those tests are interpreted. Additionally, Ms. Bakker may testify about the factors that could affect the ability to recover DNA on an item.

Specifically, Ms. Bakker will testify regarding the testing, analysis, and conclusions contained in the August 26, 2020, Laboratory Report and associated case files, with respect to DNA testing and analysis conducted by the FBI Laboratory in this case. A copy of the report has been provided to you in discovery. Ms. Bakker will testify to, and consistent with, the analysis and conclusions outlined in the Report. Ms. Bakker will explain that several items from the Sexual Assault Kit in this case, as well as several other items as specified in the report, were screened for DNA.

Of particular note, Ms. Bakker will explain the process for determining the likelihood ratio and resulting level of support for including the defendant as a contributor of the DNA that was identified for each item. This includes, as identified on pages 2-5 of the report, items 1

(vaginal swab), 2 (vaginal/cervical swabs), 9 (pants), and 12 (napkins from ground), for which there was very strong support for inclusion, and item 3 (external genital swabs), for which there was limited support for inclusion. Ms. Bakker will explain the likelihood ratios for each of the above conclusions, and whether semen was detected on each of the items, as detailed in the report that has been provided to you. Ms Bakker will also explain the testing processes and results for items 16 (screwdriver from under spare tire), 19 and 20 (swabbings from floorboard), 21 (swabs from seat), 29 (napkin from back pocket of driver's seat), and 30 (screwdriver from back pocket of passenger seat). Ms. Bakker will describe the methods and limitations that apply to the conclusions in her report, as detailed on pages 5-6 of that report.

Ms. Bakker's testimony will be based on her training and experience, and her examination and testing of the evidence listed in her report.

**Dr. Chitra Raghavan**

The Government anticipates using Dr. Chitra Raghavan as its expert in traumatic bonding and coercive control in the context of domestic violence. Dr. Raghavan is a tenured professor of forensic psychology at John Jay College, whose research, publications, and teaching have focused on trauma and coercive control in the contexts of domestic violence, sexual assault and harassment, and labor and sex trafficking. Dr. Raghavan is also the Director of the Forensic Mental Health Counseling Master's Program at John Jay College, which trains therapists, and she designed a program for master's degree students who seek to specialize in victim services. Dr. Raghavan's forensic practice is closely linked to her research and teaching and includes a diverse international client base. Dr. Raghavan has been deemed an expert in the areas of sex trafficking

and intimate partner violence in both local and federal courts. More specifically, she has served as an expert witness regarding trauma bonding and the coercive control techniques utilized by these individuals in order to explain certain paradoxical conduct of victims, such as continued compliance in the defendant's absence or after assaults.

Dr. Raghavan has testified and established that trauma bonding is the strong emotional attachment that forms between a victim and an abuser as a result of chronic interpersonal trauma in which the victim is strongly dependent on the abuser based on underlying fear. Trauma bonds are formed when three main conditions are met: 1) the existence of an imbalance of power between the abuser and the victim; 2) the creation or maintenance of the power imbalance through the use of certain control tactics; and 3) a schedule of intermittent reward and punishment that the abuser metes out in the course of the relationship. Coercive control is the use of various tactics by an abuser to strip the abused target of his or her autonomy and liberty, and to create or maintain a power imbalance. Coercive control tactics include intimidation, deprivation, micro-regulation, manipulation, blackmail, degradation, isolation, or perceived isolation and are frequently tailored to the particular vulnerabilities and needs of the victim. Isolation or perceived isolation of the victim by surrounding the victim with people who are allied with the perpetrator is a particularly important control tactic that helps to form the traumatic bond, as it both prevents the victim from reporting abusive conduct and leads the victim to negotiate with her abuser to end the abuse. Isolation also divorces the victim from her support system including family and friends.

Dr. Raghavan will opine that as a result of the use of these tactics, a cycle begins where the victim, in an attempt to form a human connection with her abuser, seeks to appease the abuser. The abuser then uses intermittent, arbitrary reward and punishment, which causes the victim to

submit to the abuser. Over time, the victim's appeasement and submission to the abuser becomes second-nature and internalized. The victim compartmentalizes her thoughts and adopts the worldview of the abuser. Once the abuser has established dominance and the traumatic bond is forged, he can diminish the frequency and severity of his coercive control techniques and use of intermittent reward and punishment. The result of the abuser's use of coercive control tactics is that the victim becomes afraid, needy, and dependent on the abuser. The victim even comes to deify the abuser and feels honored to be in the relationship.

Dr. Raghavan's testimony is important because these tactics and the resulting traumatic bond with the abuser give rise to paradoxical, incongruous behavior by the victim that is often hard for a lay person, like a juror, to understand. The victim may not leave the abusive situation, may return to the abusive situation, or may delay reporting the abuser to law enforcement. The victim also may defend the abuser, downplay the treatment she received, testify on behalf of the abuser, recant or lie to protect the abuser, or provide inconsistent responses over time. According to Dr. Raghavan, based on her own research and review of scholarly literature, within specific traumatized populations such as cults, prisoners of war, battered spouses, and sex trafficking/prostitution victims, trauma bonding occurs in at least fifty percent of the victims. See also, Chris Cantor and John Price, *Traumatic Entrapment, Appeasement and Complex Post-Traumatic Stress Disorder: Evolutionary Perspectives of Hostage Reactions, Domestic Abuse and the Stockholm Syndrome*, 41 Australian & New Zealand J. Psychiatry 377 (2007). Dr. Raghavan will opine on characteristics that make particular victims more susceptible to trauma bonding. For instance victims who have suffered prior trauma, such as sexual abuse, may be more susceptible to this type of victimization.

Expert testimony pertaining to trauma bonding and coercive control tactics used by individuals engaged in domestic violence would aid the average juror in understanding the anomalous behavior of the victims of these types of offenses, including, as discussed *supra*, why a victim would stay with or return to the abuser and would lie for the abuser or downplay prior abuse.

Thus, the proffered testimony is relevant and helpful to explain these behaviors, which might appear unusual to a lay juror, and would help dispel any juror misconceptions regarding how someone would be expected to behave under these circumstances. See Judith Herman, *Trauma and Recovery: The Aftermath of Violence and Complex PTSD: A Syndrome in Survivors of Prolonged and Repeated Trauma*, 5(3) Journal of Traumatic Stress 377 (1992).

Dr. Raghavan will not testify about the credibility of the victim or witnesses. In fact, Dr. Raghavan has never met the victim in this case, nor has she viewed any statements of the victim. She will not interview the victim before trial. Dr. Raghavan will testify as to these types of victims in general terms, not the behavior exhibited by the victim in this case. Dr. Raghavan may also be called upon to answer hypothetical questions regarding the above-described subject based upon evidence already presented at trial.

To the extent that any of the testimony described above is considered to be expert testimony within the meaning of Federal Rule of Evidence 702, this filing provides notice of such testimony. The United States reserves the right to question the expert regarding other matters that may be raised during cross-examination by the defendant, based upon testimony elicited from the defendant's experts, if any, or other witnesses, or the evidence introduced by the defendant. To the extent the Court allows the defendant the same right, the government

reserves the right to elicit any additional testimony that this expert is qualified to provide should the need arise based on further developments in preparing for and during the trial.

At this time, the government requests discovery pursuant to Rule 16(b)(1)(C)(i).

                              Respectfully Submitted,

                              Channing D. Phillips
                              Acting United States Attorney


By:     /s/_____
         Nicholas G Miranda
         Ryan Creighton
         Assistant United States Attorneys